# 2003 DTA 143

JAN 09 2004

SERIALS DEPARTMENT
HARVARD LAW SCHOOL LIBRARY

## TRIBUNAL DE CIRCUITO DE APELACIONES
## CIRCUITO REGIONAL I DE SAN JUAN
## PANEL II

CENTRO AUTOMOTRIZ SANTA ROSA, INC.
Recurrente

v.

ADMINISTRACION DE TERRENOS DE PUERTO RICO
Recurrida

Núm. KLRA-03-00042

San Juan, Puerto Rico, a 10 de septiembre de 2003

Panel integrado por su Presidenta, la Juez Rodríguez de Oronoz,
y las Juezas Peñagarícano Soler y Bajandas Vélez

Bajandas Vélez, Jueza Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Mediante el recurso de epígrafe, el recurrente, Centro Automotriz Santa Rosa, Inc., nos solicita que revoquemos la resolución emitida mediante carta el 26 de diciembre de 2002 por la Administración de Terrenos del Estado Libre Asociado de Puerto Rico (Administración). Dicha resolución dejó sin efecto la subasta 94-01 adjudicada al recurrente. Fue, además, objeto de reconsideración ante la Administración, la cual ésta declaró sin lugar el 17 de enero de 2003.

Analizados los autos que obran ante nos y el derecho aplicable, resolvemos expedir el auto de revisión solicitado, confirmar la resolución recurrida y devolver el caso para que la agencia actúe de conformidad con lo aquí resuelto.

### I

El 24 de noviembre de 1993, la Administración reconoció mediante carta el interés de la parte recurrente en adquirir una finca de 6.0537 cuerdas sita en el Barrio Hato Rey Norte de San Juan (Avenida Kennedy) ██ de su propiedad. Apéndice del Recurrente, pág. 1. El 23 de marzo de 1994, la Administración cursó otra carta al recurrente indicándole que *"luego de evaluar la ubicación y el mejor uso de los terrenos, la Administración ha determinado que venderá éstos bajo un procedimiento de solicitar propuestas para su desarrollo por competencia, entre los desarrolladores que así lo interesen."* Apéndice del Recurrente, pág. 2.

Así las cosas, el 20 de septiembre de 1994, la Administración notificó al recurrente mediante carta certificada con acuse de recibo una invitación para participar en la subasta núm. 94-01 para la venta de dicha parcela. La misma se llevaría a cabo el 14 de octubre de 1994, a las 10:00 AM, en las oficinas de la Administración. Apéndice del Recurrente, pág. 3.

El 23 de septiembre de 1994 se publicó el correspondiente Aviso de Subasta Pública núm. 94-01 en El Nuevo Día. Apéndice del Recurrente, pág. 4. El precio mínimo de la subasta sería de $1,546,600.00. Entre las Condiciones Generales de la subasta figuran, entre otras, la número 8, de particular relevancia al caso ante nos:

*"8. El propósito de la Subasta 94-01 es el desarrollo de la propiedad conforme a su mejor uso, por lo que el Comité de Subastas se reserva el derecho de aceptar o rechazar todas o cualquier licitación recibida y de recomendar al Director Ejecutivo de la Administración de Terrenos, la adjudicación de la buena pro de la subasta en beneficio de los mejores intereses de la administración tomando en consideración, entre otros*

*factores, aquéllos que no sean los de precio solamente. **Así, también, se reserva el derecho de cancelar sin ningún perjuicio, cualquier adjudicación que se haya hecho de esta subasta, cuando los mejores intereses de la Administración así lo requieran.** "* (Enfasis nuestro).

Entre las Condiciones Especiales figuran las siguientes:

*"1. La adjudicación de la 'buena pro' estará sujeta a la aprobación de la Junta de Gobierno de esta Administración y a la aprobación de la Consulta de Ubicación y venta del inmueble por la Junta de Planificación de Puerto Rico.*

...

*6. Al proponente que se le adjudique la venta del terreno, se le acreditará el depósito del cinco (5) por ciento del importe de su oferta al precio de compraventa del inmueble. Si posteriormente ésta no adquiere la propiedad, la Administración de Terrenos retendrá el cinco (5) porciento depositado.*

*7. La Administración de Terrenos se reserva el derecho de retrotraer los terrenos al mismo precio de venta, si en un término de tres (3) años a contar desde la fecha de compraventa del mismo, no se realiza el proyecto para el cual fueron vendidos.*

...

*10. Las escrituras de compraventa se firmarán dentro de los próximos treinta (30) días, a contar desde la aprobación de la Junta de Gobierno de la Administración de Terrenos y la Consulta de Ubicación de la Junta de Planificación, tiempo en el cual la o las personas a las que se le adjudique la venta del terreno, deben depositar la diferencia del importe de la oferta.*

*11. Si al transcurrir los treinta (30) días antes señalados, el comprador no ha adquirido la propiedad subastada conforme al apartado número (10), la Administración de Terrenos cobrará un cargo por extensión sobre el precio de compraventa, el cual se computará a base del dos por ciento (2%) sobre el interés preferencial ("prime rate") aplicado a dicho precio, a computarse por cada día que se extienda la firma de la escritura de compraventa.*

*12. La Administración de Terrenos se reserva el derecho de cancelar las negociaciones, una vez adjudicada la subasta núm. 94-01, si en el término concedido para que se firmen las escrituras de compraventa, el proponente al que se le adjudique la subasta núm. 94-01, no está disponible para firmar las mismas.*

*13. Una vez adjudicada la subasta núm. 94-01, la Administración y el proponente agraciado con la buena pro de la misma, firmarán un contrato el cual contendrá las especificaciones de la subasta núm. 94-01."* Apéndice del Recurrente, págs. 8-11.

El 7 de diciembre de 1994, el recurrente presentó su oferta oficial para la adquisición de la finca por la cantidad de $1,580,000.00 dólares. De igual forma, aceptó las Condiciones Generales de la subasta, excepto que en la número 3 de dichas condiciones, requirió posponer la fecha límite de presentación de licitaciones al 7 de diciembre de 1994. Asimismo, solicitó una modificación a la Condición Especial número 3 a los fines de que leyera como sigue:

*"La propiedad objeto de subasta se venderá con la garantía de que la misma es apta en toda su extensión para el desarrollo del proyecto contemplado por la aquí oferente, sus sucesores o cesionarios. La*

*Administración de Terrenos responderá de evicción y saneamiento conforme a derecho y representa y garantiza al licitador victorioso que en la infraestructura de·la propiedad ni sobre su superficie existen materiales tóxicos ni otras materias que puedan constituir riesgos ambientales.*" Apéndice del Recurrente, pág. 12.

Como parte de su oferta, el recurrente propuso añadir una Condición Especial núm. 18 como sigue:

*"En eventualidad de que a la proponente, sus sucesores o cesionarios, se le otorguen permisos condicionados o que resulten onerosos o restrinjan el uso de la totalidad o una porción de los mismos para la construcción del proyecto contemplado, entonces la oferente podrá retirar su oferta y la Autoridad de Terrenos de Puerto Rico le [de]volverá el deposito (sic) adelantado y todos los gastos incurridos en el trámite de los permisos necesarios."* Apéndice del Recurrente, pág. 13.

Finalmente, el recurrente estipuló que el uso de la propiedad objeto de la subasta sería para el desarrollo de un centro automotriz compuesto de facilidades para la venta y servicio de vehículos de motor, venta de piezas y accesorios para automóviles y facilidades para el financiamiento de éstos. Junto con la oferta, el recurrente hizo un depósito mediante cheque por la cantidad de $79,000.00 dólares. Apéndice del Recurrente, pág. 16.

El 9 de febrero de 1995, la Administración notificó al recurrente que su oferta no cumplía con las Condiciones Especiales de la subasta, por lo que le concedió el término de diez días para el retiro de dicha propuesta, o en la alternativa, la confirmación de su aceptación a las Condiciones Especiales de la subasta. El 24 de febrero de 1995, el recurrente optó por confirmar su aceptación de todas las Condiciones Generales y Especiales según establecidas originalmente en la subasta. Apéndice del Recurrente, pág. 19.

El 15 de marzo de 1995, la Administración cursó una misiva al recurrente notificando la adjudicación de la subasta a su favor. Se le indicó, además, que próximamente se comunicarían para requerirle los documentos necesarios para comenzar los trámites ante la Junta de Planificación. El 11 de abril de 1995, la Administración le requirió al recurrente los siguientes documentos a los fines de tramitar la consulta de ubicación correspondiente ante la Junta de Calidad Ambiental y la Junta de Planificación:

*"1. Memorial explicativo del proyecto, abundando en los siguientes aspectos:*

*a) Descripción de las obras propuestas, costos y procedencia de los fondos para su construcción.*

*b) Propósito, justificación y servicios a ofrecer por las facilidades propuestas.*

*c) Empleos a generarse en las fases de construcción y operación.*

*d) Infraestructura disponible (agua, luz, alcantarillado pluvial y sanitario, vías de acceso, etc.).*

*2. Sepia del plano esquemático del proyecto, demostrando todas las facilidades a establecerse.*

*3. Formulario Ambiental, JP-826, debidamente cumplimentado.*

*4. Forma Evaluativa JP-187, debidamente cumplimentada.*

*5. De ser necesario utilizar material de relleno para el proyecto, deberá incluir un mapa con la ruta de acarreo desde el lugar de procedencia del mismo hasta el proyecto."* Apéndice del Recurrente, págs. 21-22.

El 14 de agosto de 1995, la Junta de Calidad Ambiental notificó al recurrente haber analizado el documento

ambiental sometido. Además, se le informó que debía aún someter los comentarios del Departamento de Recursos Naturales y Ambientales y del Servicio Federal de Pesca y Vida Silvestre (*"Fish & Wildlife Service"*), con el fin de que la JCA pudiese emitir sus comentarios.

El 27 de noviembre de 1995, el Servicio Federal de Pesca y Vida Silvestre, mediante carta suscrita por el Sr. James P. Oland, notificó a la Autoridad sus comentarios respecto a la finca objeto de la subasta. En la misma concluyó que el Gobierno de Puerto Rico no debía realizar la venta de dicha parcela con el propósito de un desarrollo comercial. Indicó que dicho terreno está compuesto por un sistema de humedales, ampliamente protegidos por una política pública federal que promueve su protección, conservación y manejo. Apuntó que el comprador debía ser orientado en cuanto a las características de dicho terreno, cuya naturaleza lo sujeta a la reglamentación estatal y federal, por lo que su adquisición no provee garantía alguna al comprador de que el proyecto según propuesto pueda llevarse a cabo. Por último, señaló que el terreno sería mejor utilizado por el Gobierno estatal como una laguna de retención (*"ponding area"*) que no sólo protegería los humedales adyacentes, sino también proveería al público del beneficio de una protección continua para toda el área comercial de la Avenida Kennedy. Apéndice del Recurrente, págs. 28-30.

El 20 de marzo de 1996, el recurrente presentó ante la Administración un borrador de carta en el que sugería la reconsideración de la determinación del Servicio Federal de Pesca y Vida Silvestre. El 27 de junio de 2000, el recurrente notificó a la Administración de su intención de ejercitar próximamente la opción de compra sobre la finca. A su vez, propuso efectuar unas pruebas de terreno en el referido predio. ■

El 26 de diciembre de 2002, la Administración notificó al recurrente haber dejado sin efecto la adjudicación de la subasta 94-01. Adujo, como razón, la imposibilidad de la Administración en mantener paralizada una transacción sobre terrenos públicos de rápido desarrollo, iniciada en el 1995. Además, la Administración hizo referencia a la recomendación desfavorable que hizo el Departamento de Recursos Naturales mediante carta de 15 de octubre de 1995. En dicha carta, se estableció que aproximadamente tres cuartas partes de la finca en cuestión es un sistema de manglares, lodazales y ciénagas estacionales que ha sido identificado como una de las 12 áreas críticas de manglar en Puerto Rico. Dicha carta, a su vez, determinó que la política pública imperante para los manglares y otros humedales costeros en la zona de la Avenida Kennedy hace hincapié en evitar actividades y lotificaciones que puedan causar el deterioro o destrucción de los sistemas naturales de preservación del medio ambiente, puesto que dichos humedales constituyen hábitats para especies en peligro de extinción. [3] Finalmente, la administración apuntó las *"reiteradas dificultades"* del recurrente en obtener los permisos para este desarrollo. Apéndice del Recurrente, págs. 35-36.

El 3 de enero de 2003, el recurrente presentó reconsideración ante la Administración. Adujo que continuaba con su interés en completar la transacción, por lo que solicitó un listado en detalle de los trámites pendientes. El 17 de enero de 2003, la Administración cursó una carta al recurrente en la que resolvió mantener su previa determinación. Fundamentó su posición en que el recurrente no hizo planteamiento alguno que atendiese los fundamentos expresados para dejar sin efecto la subasta. Apéndice del Recurrente, pág. 38.

Inconforme, el recurrente acudió ante nos mediante recurso de revisión administrativa presentado el 27 de enero de 2003. Señaló la comisión del siguiente error por la agencia:

*"COMETIO GRAVE Y MANIFIESTO ERROR DE DERECHO LA ADMINISTRACION DE TERRENOS DE PUERTO RICO AL DEJAR SIN EFECTO OCHO AÑOS DESPUES DE ADJUDICADA, UNA SUBASTA MEDIANTE LA CUAL SE HABIA ADJUDICADO A CENTRO AUTOMOTRIZ SANTA ROSA, INC. EL DERECHO A ADQUIRIR POR COMPRAVENTA UNA PARCELA DE TERRENO DE 6.0537 CUERDAS. El ERROR DE DERECHO CONSISTE EN QUE LA AGENCIA-RECURRIDA NO INTIMO PREVIAMENTE A LA ADJUDICATARIA-RECURRENTE QUE DE NO COMPLETARSE LOS TRAMITES DE COMPRA SE EJERCITARIA EL REMEDIO DRASTICO DE DEJAR SIN EFECTO LA SUBASTA, VIOLENTANDO ASI LA*

*GARANTIA CONSTITUCIONAL SOBRE EL DEBIDO PROCEDIMIENTO DE LEY Y VIOLANDO LAS DISPOSICIONES DE SU PROPIO REGLAMENTO."*

En esencia, el recurrente señaló que la Administración nunca le informó el resultado de los trámites ante la Junta de Planificación. Además, expuso que la finca objeto de la subasta sufrió una merma por motivo de las obras realizadas en la Avenida Kennedy. Por otro lado, argumentó que la Administración de Terrenos nunca contestó la solicitud de permiso para llevar a cabo pruebas de terreno en el año 2000. Asimismo, adujo que la agencia debió apercibir o informar a la recurrente de lo que estaba ocurriendo, lo que alegadamente trastoca el debido procedimiento de ley. Apuntó que la agencia guardó completo silencio sobre la cantidad de $79,0000.00 dólares dada en depósito, al igual que no tomó en consideración los gastos incurridos por el recurrente. Del mismo modo, alegó que la Administración violó el Artículo XX de su propio Reglamento Para la Adquisición y Disposición de Propiedades Inmuebles de la Administración de Terrenos, ya que ninguna de las situaciones que allí se relacionan fue invocada por la agencia como fundamento para dejar sin efecto la subasta de autos. [4]

Emitimos resolución el 10 de febrero de 2003 concediéndole al Procurador General treinta días para fijar su posición respecto a la solicitud de revisión del epígrafe. El 12 de febrero, el recurrente presentó una moción informativa certificando el acuse de recibo de la notificación a todas las partes.

El 21 de febrero de 2003, el Procurador General presentó Moción Retirando Moción de Representación Legal a favor de la Administración de Terrenos, ya que dicha entidad gubernamental tiene personalidad jurídica propia para comparecer por sí misma ante los foros apelativos. Emitimos resolución el 27 de febrero de 2003 aceptando el retiro del Procurador General.

Así las cosas, el 24 de febrero de 2003, la Administración de Terrenos presentó *"Escrito de la Recurrida Administración de Terrenos de Puerto Rico Fijando Posición en Cuanto a Solicitud de Revisión."* En primer lugar, la agencia planteó que el recurrente no puede pretender desconocimiento, ya que su propio consultor fue quien inició las gestiones ante el Departamento de Recursos Naturales y el Servicio Federal de Pesca y Vida Silvestre, recibiendo notificación sobre los serios reparos de estas agencias al proyecto. En segundo lugar, la agencia recurrida argumentó que resulta contrario al mandato legislativo de la Administración permitir una demora inusitada en los trámites de compraventa de terrenos, los cuales conllevan la posibilidad de aumento significativo en el precio. Dicho de otro modo, alegó que la congelación de un terreno por más de ocho años sin culminar el trámite de permisos resulta una práctica contraria a la política pública de la agencia y a su mandato administrativo.

En tercer lugar, la Administración sostuvo que el recurrente tenía pleno conocimiento de que la compraventa, según las condiciones de la subasta, quedó sujeta a la obtención de los permisos de las agencias reguladoras correspondientes. Por otro lado, adujo que la notificación cursada al recurrente cumple sustancialmente con el debido proceso de ley. Por último, en cuanto al depósito, la Administración afirmó, entre otros fundamentos, que la demora inusitada en los trámites de solicitud y obtención de los permisos, siendo imputables al recurrente, justifican la retención del depósito.

Así trabada la controversia, pasamos a resolver.

## II

Como cuestión de umbral, reafirmamos el principio de que a toda determinación administrativa le cobija una presunción de legalidad y corrección. Tal presunción deberá sostenerse por este foro, a menos que la misma logre ser derrotada. *E.L.A. v. Lucas Malavé h/n/c Supermercado Jardines de Caparra,* **2002 J.T.S. 103**; *A.R.P. E. v. Junta de Apelaciones Sobre Construcciones y Lotificaciones,* 124 D.P.R. 858, 864 (1989); *Henríquez v. Consejo de Educación Superior,* 120 D.P.R. 194, 210 (1987); *Murphy Bernabé v. Tribunal Superior,* 103 D.P. R. 692, 699 (1975). Ello, debido a que las agencias administrativas poseen la experiencia y conocimientos

especializados sobre los asuntos que están dentro de sus facultades y responsabilidades. *Fac. C. Soc. Aplicadas, Inc. v. C.E.S.,* 133 D.P.R. 521, 533 (1993); *Asoc. Drs. Med. Cui. Salud v. Morales,* 133 D.P.R. 567, 589 (1993).

En vista de lo anterior, resulta que toda intervención con dichas determinaciones sólo estará justificada cuando la agencia haya obrado de forma arbitraria, ilegal, o en forma tan irrazonable que su actuación constituya un claro abuso de discreción. Del mismo modo, se intervendrá cuando la determinación no pueda ser sostenida a la luz de la doctrina de la evidencia sustancial. *Mun. de San Juan v. J.C.A.,* **2000 J.T.S. 193**, 152 D.P.R. ____ (2000); *Misión Industrial de P.R., Inc. v. Junta de Planificación,* 146 D.P.R. 64, 131 (1998); *Fuertes v. A.R.P.E.,* 134 D.P.R. 947, 953 (1993). A estos fines, ésta se ha definido como *"aquella [prueba] pertinente que una mente razonable pueda aceptar como adecuada para sostener una conclusión"*. *Ramírez v. Departamento de Salud,* 147 D.P.R. 901, 905 (1999); *Associated Insurance v. Comisionado de Seguros,* 144 D.P.R. 425, 437 (1997), *Hilton Hotels v. Junta de Salario Mínimo,* 74 D.P.R. 670, 687 (1953).

Para sustentar la posición de que no existe evidencia sustancial que apoye las determinaciones de la agencia, la parte afectada debe demostrar que existe *"otra prueba en el récord que razonablemente reduzca o menoscabe el peso de tal evidencia hasta el punto de que un tribunal no pueda concienzudamente concluir que la evidencia sea sustancial, en vista de la prueba presentada... y hasta el punto que se demuestre claramente que la decisión [del organismo administrativo] no está justificada por una evaluación justa del peso de la prueba"*. *Metropolitana v. A.R.P.E., supra,* a la pág. 213, (citando a *Hilton Hotels v. Junta de Salario Mínimo, supra*).

Por otro lado, se ha reiterado que los procedimientos de subastas tienen el objetivo principal de obtener el mejor contrato posible para el Estado. *Mármol Co. Inc. v. Adm. Servicios Gens.,* 126 D.P.R. 864 (1990). Las mismas van dirigidas a lograr eficacia, honestidad y corrección para proteger el interés público a través de la competencia libre y transparente entre licitadores. *RBR Construction S.E. v. Autoridad de Carreteras,* **2000 J.T.S. 7**; 149 D.P.R. ____ (2000); *Hatton v. Municipio de Ponce,* 134 D.P.R. 1001 (1994).

Además, se ha reiterado que a pesar de que las subastas son procedimientos informales *sui generis* con ciertas características adjudicativas, la parte adversamente afectada por la determinación tiene derecho a la revisión judicial de acuerdo al ordenamiento dispuesto en la Ley de Procedimiento Administrativo Uniforme, Ley Núm. 170 de 12 de agosto de 1988, según enmendada (LPAU), 3 L.P.R.A. Sec. 2101 *et seq. Velázquez v. Administración de Terrenos,* **2001 J.T.S. 35**, 153 D.P.R. ____ (2001). Desde luego, ello debido a que la adjudicación de las subastas se encuentra subordinada a los principios de derecho administrativo antes expuestos.

De este modo, la revisión judicial de subastas exige que la decisión administrativa esté fundamentada, aunque sea de forma sumaria, y se citen y discutan las normas reglamentarias sobre las que descansa la decisión. Particularmente importante resulta la expresión de las razones y los trámites ocurridos en la agencia de forma que se ponga en conocimiento a las partes y al tribunal de los fundamentos que propiciaron tal decisión. *RBR Construction, S.E. v. Autoridad de Carreteras y Transportación de P.R. y su Junta de Subastas,* ____ D.P.R. ____ (2000), **2000 J.T.S. 7**; *L.P.C. & D., Inc. v. Autoridad de Carreteras y Transportación y otros,* ____ D.P.R. ____ (2000), **2000 J.T.S. 9**.

La adjudicación de subastas se encuentra regulada por la sección 3.9 de L.P.A.U., 3 L.P.R.A. sec. 2169. Dicha sección dispone que las subastas se regirán por procedimientos informales y que su reglamentación y términos serán establecidos por cada una de las agencias, las cuales tendrán discreción para adoptar las normas procesales necesarias aplicables al procedimiento. *RBR Construction S.E. v. Autoridad de Carreteras, supra.*

Cada reglamento debe incluir, en particular, los factores específicos que se han de utilizar para evaluar las propuestas de subastas. Entre los más reconocidos por la jurisprudencia se encuentran los siguientes: (1) que las

propuestas sean conformes a las especificaciones de la subasta; (2) la habilidad del postor para realizar y cumplir con el contrato; (3) la responsabilidad económica del licitador, su representación e integridad comercial, entre otros. *Continental Const. Corp. v. Municipio de Bayamón,* 115 D.P.R. 559 (1984).

A tenor con los preceptos arriba expuestos, y su ley habilitadora, la Administración de Terrenos promulgó el 29 de enero de 1992, el Reglamento Para la Adquisición y Disposición de Propiedades Inmuebles, Núm. 4668 (*"el Reglamento"*). Dicho reglamento particularmente establece los criterios y circunstancias que deben existir para la cancelación de subastas, las alternativas que tiene la Administración de advenir inelegible un solicitante cuya propuesta haya sido previamente seleccionada mediante subasta y los términos de reconsideración y de revisión judicial que rigen en dichas situaciones. De este modo, el Artículo XX de dicho Reglamento, titulado *"CASOS EN QUE LA ADMINISTRACION PODRA DESISTIR DE LA VENTA O DISPOSICION Y CANCELAR LA SUBASTA"* reza como sigue:

"A. La administración podrá desistir de la venta o disposición y cancelar la subasta, terminando las negociaciones en cualquier de los siguientes casos:

*1. cuando la Junta de Gobierno, la Junta de Planificación o cualquier agencia reguladora deniegue su aprobación.*

*2. cuando a juicio del Director Ejecutivo, las propuestas recibidas no cumplan satisfactoriamente con los requisitos que la Administración haya publicado o comunicado a los proponentes o con alguna disposición de este Reglamento o del Reglamento de Subastas.*

*3. cuando luego de tomada una determinación preliminar de disponibilidad, a tono con el Artículo XV de este Reglamento, alguna agencia gubernamental por circunstancias imprevistas y excepcionales requiera que el título de propiedad le sea transferido o que la propiedad sea reservada para algún fin público; o*

*4. cuando por disposición de ley, la propiedad debe ser destinada a algún fin público."*

Por último, cabe señalar que nuestra jurisprudencia ha puntualizado la exigencia de que se cumpla estrictamente con las condiciones e instrucciones generales, y las especificaciones de una subasta. Ello responde a una sana política pública para prevenir situaciones de favoritismo y corrupción durante los procesos de subasta efectuados por las agencias públicas. Del mismo modo, su observancia debe evitar el incumplimiento por los licitadores de las ofertas agraciadas en tales subastas. *Mar-mol Company v. Administración de Servicios Generales,* 126 D.P.R. 864 (1998); *Continental Construction Corp. v. Municipio de Bayamón,* 115 D.P.R. 559 (1984); *Justiniano v. E.L.A.,* 100 D.P.R. 334 (1971).

## III

A la luz de la normativa antes expuesta, debemos considerar el señalamiento de error planteado por el peticionario, a saber: si erró la administración de terrenos al dejar sin efecto la subasta del caso del epígrafe. Particularmente, debemos dilucidar si la Administración tenía la obligación de intimar previamente al recurrente sobre la posibilidad de la cancelación de la subasta por el fundamento de que no se completaron los trámites de compra correspondientes. Tras una lectura detenida de las Condiciones Generales y Especiales de la subasta 94-01, así como los demás documentos del apéndice, estimamos que la Administración no erró al proceder como lo hizo. Veamos.

La Condición General número 8 de la subasta señala expresamente la facultad de la Administración para cancelar cualquier adjudicación cuando ello responda a los mejores intereses de la Administración. De la misma forma, la Administración estableció en la Condición General número 7, el derecho de retroventa sobre el aludido terreno, efectivo durante los tres años posteriores a la compraventa y equivalente al precio de venta. Tal

derecho, se expresó, podía ejecutarse en la medida en que el proyecto para el cual el terreno fue vendido no se hubiese realizado aún. De ello se desprende claramente el interés y la política general de la Administración en que los terrenos vendidos respondan rápidamente al crecimiento y desarrollo económico dispuesto.

Notamos que si bien el recurrente hizo una oferta en primera instancia modificando algunas Condiciones Generales y Especiales, de ninguna forma objetó o rechazó como parte de su oferta, el derecho de reserva contenido en la Condición General número 8 de la subasta. Del mismo modo, el recurrente tampoco se opuso al derecho de retroventa a favor de la Administración contenido en la Condición General número 7. Del expediente ante nos surge claramente que el contenido y los derechos establecidos en dichas condiciones quedaron inalterados al momento de la adjudicación a favor del recurrente. Por lo tanto, concluimos que éste no puede alegar desconocimiento del derecho que le asiste a la Administración de cancelar las subastas adjudicadas en atención al interés público, en virtud de la Condición número 8 de la subasta. Tampoco el recurrente puede alegar desconocimiento de la amplia facultad de retroventa a favor de la Administración cuando el terreno en cuestión no ha podido desarrollarse conforme a lo estipulado.

La Administración fundamentó su decisión de cancelar la subasta en atención a las siguientes consideraciones. En primer lugar, el recurrente nunca sometió formalmente una enmienda al proyecto luego de que el Departamento de Recursos Naturales y el Servicio Federal de Pesca y Vida Silvestre levantaron reparos al mismo, los cuales, sin duda, afectaron de manera significativa la viabilidad de dicho desarrollo. Del mismo modo, afirmó que la obligación única del recurrente en la tramitación y obtención de permisos no debió afectarse por la merma mínima en cabida que sufrió el terreno luego de la adjudicación. Por último, señaló la Administración que ante la falta de endosos por parte de Recursos Naturales y el Servicio Federal de Pesca y Vida Silvestre, el recurrente no continuó con gestión ulterior alguna para atenderlas, prolongando así de forma irrazonable la incertidumbre acerca de la viabilidad del proyecto.

En conclusión, el propio recurrente con sus actuaciones e inacción por espacio de aproximadamente cuatro años (1997-2001) propiciaron la determinación de la Administración de cancelar la subasta que se le adjudicó en el 1995.

Así, no erró la Administración al no intimar al recurrente que iba a cancelar la subasta. Tampoco hubo violación alguna de su debido proceso de ley, pues el recurrente fue notificado de la cancelación en forma oportuna y fundamentada, y éste la cuestionó tanto a nivel administrativo como judicial.

El recurrente plantea además que la Administración no invocó ninguna de las situaciones contenidas en el Artículo XX del Reglamento como fundamento para dejar sin efecto la subasta. Dicho artículo establece cuatro situaciones específicas en las que la Administración podrá desistir de la venta o disposición de los terrenos o cancelar las subastas. Entendemos que dicho planteamiento resulta improcedente. La primera situación contenida en el Artículo XX particularmente señala que procederá la cancelación de la subasta *"cuando la Junta de Gobierno, la Junta de Planificación o cualquier agencia reguladora deniegue su aprobación."* Surge indubitadamente del expediente que tanto la agencia federal de Pesca y Vida Silvestre (Fish and Wildlife Service) como el Departamento de Recursos Naturales del Estado Libre Asociado fundamentaron su oposición al proyecto debido a que la condición del terreno, consistente de humedales y manglares iba a quedar seriamente afectada por el desarrollo y se violaría con éste la rígida reglamentación vigente para su conservación. Ello de por sí constituye razón suficiente para la determinación tomada por la Administración.

Nos resta atender, en última instancia, la petición del recurrente en torno a la devolución de los $79,000.00 dólares depositados por éste en diciembre de 1994. El recurrente reclama que en vista de la cancelación de la subasta, al menos tiene derecho a que tales dineros le sean devueltos. También aduce que ha incurrido en cuantiosos gastos en el proyecto, por lo que reclama que la Administración le devuelva el depósito.

Por su parte, la Administración señala en su comparecencia ante nos que su intención es imponerle responsabilidad al recurrente por la demora inusitada exhibida por éste en el trámite de obtener permisos para el proyecto. En la alternativa, argumenta que, aunque el recurrente prevalezca en el recurso, procede retener el depósito, pues sólo tiene derecho a la devolución del mismo si las agencias reguladoras concluyen de forma final y firme que el proyecto no puede cumplir los requisitos necesarios para que se emitan las aprobaciones solicitadas.

En vista de las posiciones encontradas de las partes en cuanto a este asunto y no habiendo sido éste atendido por la Administración en su carta de 26 de diciembre de 2002, no nos encontramos en posición de resolver dicho extremo. De este modo, resulta necesario que la Administración dilucide, mediante una vista a esos efectos, si procede o no la devolución de dicho depósito. Dicha determinación deberá tomar en consideración la ley y el Reglamento de la Administración, y los términos estipulados en la subasta 94-01.

## IV

Por los fundamentos anteriormente expresados, se expide el auto de revisión solicitado y se confirma la resolución de la Administración de Terrenos notificada en carta de 26 de diciembre de 2002. Se devuelve el caso a dicha agencia para la celebración de una vista en la cual se dilucide si procede o no devolver al recurrente el depósito dado o alguna parte de éste.

Lo acordó y manda el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

### ESCOLIOS 2003 DTA 143

**1.** La Descripción de la parcela es como sigue: *"URBANA: Parcela de terreno radicada en el Barrio Hato Rey Norte del término municipal de San Juan, Puerto Rico, con una cabida superficial de veintitrés mil setecientos noventa y tres punto tres mil cuatrocientos sesenta y dos metros cuádrados (23,793.3462 m.c.), equivalentes a seis cuerdas (6.0537 cdas.). Colinda por el Norte, con una Calle Marginal que la separa de la Avenida John Fitzgerald Kennedy y con la Compañía de Fomento Industrial de Puerto Rico; por el Sur, con E.E.R. Enterprises, Inc. y con el Municipio de San Juan; y por el Oeste, con una Calle Marginal que la separa de la Avenida John Fitzgerald Kennedy y con E.E.R. Enterprises, Inc."* Apéndice del Recurrente, pág. 5.

**2.** Dicha propuesta, según alega el recurrente, no fue contestada o atendida por la Administración. No obstante, surge de los autos que luego de dicha solicitud, el recurrente, a través de su presidente, el Sr. Ramón Vega, informó a la Administración que se proponía someter un plano alterno para desarrollar el proyecto por fases comenzando por la parte *"up-land"*. Apéndice de la Recurrida, pág. 9. La agencia alegó finalmente que el anuncio del recurrente suponía su desistimiento a realizar las pruebas del terreno, por lo que consideró innecesario contestar dicha carta. Escrito de la recurrida, pág. 5.

**3.** Apéndice del Recurrido, pág. 7.

**4.** Dicho Reglamento dispone:

*"ARTICULO XX: CASOS EN QUE LA ADMINISTRACION PODRA DESISTIR DE LA VENTA O DISPOSICION Y CANCELAR LA SUBASTA.*

*A. La administración podrá desistir de la venta o disposición y cancelar la subasta, terminando las negociaciones en cualquier de los siguientes casos:*

*1. cuando la Junta de Gobierno, la Junta de Planificación o cualquier agencia reguladora deniegue su aprobación.*

*2. cuando a juicio del Director Ejecutivo, las propuestas recibidas no cumplan satisfactoriamente con los requisitos que*

*la Administración haya publicado o comunicado a los proponentes o con alguna disposición de este Reglamento o del Reglamento de Subastas.*

*3. cuando luego de tomada una determinación preliminar de disponibilidad, a tono con el Artículo XV de este Reglamento, alguna agencia gubernamental por circunstancias imprevistas y excepcionales requiera que el título de propiedad le sea transferido o que la propiedad sea reservada para algún fin público; o*

*4. cuando por disposición de ley, la propiedad debe ser destinada a algún fin público."*